**Carlisle HYDER, Petitioner,**

v.

**Dr. George J. BETO, Director, Texas Department of Corrections, Respondent.**

**Civ. A. No. 3–1801.**

United States District Court
N. D. Texas,
Dallas Division.

April 13, 1967.

Eugene Jericho, Dallas, Tex., for petitioner.

Waggoner Carr, Atty. Gen., Howard M. Fender, Gilbert J. Pena, Asst. Attys. Gen., Austin, Tex., Henry Wade, Dist. Atty., Dallas County, James Williamson, Asst. Dist. Atty., Dallas, Tex., for respondent.

*Opinion of the Court*

DAVIDSON, Senior District Judge.

During the past few weeks we have tried a number of habeas corpus cases where State prisoners were seeking relief from judgments rendered in the State court. We found little in any of the petitions sustaining the claims of the petitioner and justifying his liberation.

In many cases they were from those sentenced for life, and in a large number of them the police were charged with brutality, the police, the FBI and the arresting officers.

One of these cases is now before us in which Hyder makes the following allegations with reference to his treatment at the time of his arrest:

On January 18, 1964, en route by Greyhound Bus from El Paso, Texas to Spartanburg, South Carolina, petitioner, during a lay-over in Dallas, walked a few blocks from the Bus Station, ate and was looking for a hotel to rest in when he was confronted by police with guns approximately three to five blocks from the City Hall. He was arrested by the police officers and taken to the City Jail. The police told him that he had robbed a bar lounge on Elm Street a few minutes before his arrest. At the City Jail he was beaten and kicked

by the police who broke his glasses, his bridgework and one good tooth. The police used violent physical force and extreme brutality so as to make him confess to the crime. He was not allowed to contact his people or to contact an attorney. The police tricked him by submitting a paper which he could not read because his glasses had been broken, which the police represented to him to be a receipt for his belongings to be returned to him upon his release later in the day, which was in fact a confession. He was not taken before a magistrate, as required by the law of Texas, to be informed of his rights. On February 13, 1964, an attorney at law visited him in the County Jail, informed him that he had been appointed by the Court to represent him. He advised such counsel about the police brutality and the involuntary confession. The attorney tried to persuade him to plead guilty for a term of 15 years, which the attorney said the prosecutor would recommend. He refused the offer on the ground he was not guilty. When the jury was being selected he spoke out to the Judge of the Court stating that he refused to accept his legal counsel because his counsel believed him to be guilty and wanted him to plead guilty for a 15-year sentence. The Court did not accept defendant's motion for a new counsel because he stated he believed the appointed counsel was a young attorney who could handle the case properly. During the trial the petitioner wanted to testify in his own behalf. His counsel demanded that he do no such thing as his testimony concerning the police brutality would place a bad name on the police force. When petitioner started to arise in the trial his counsel grabbed his arm and forced him to remain still and not testify. During the trial the victim identified petitioner and related that at the time of the crime petitioner was dressed in a brown overcoat and brown hat. Petitioner denies ever having worn or owned such clothes, and states that no

such clothes were found upon him at the time of his arrest. He states that at the time of leaving El Paso until the time of his arrest he was dressed in a grey sports coat, grey hat and brown satin slacks. He states that the victim testified that petitioner had been continuously drinking beer at the bar lounge that he was charged with robbing for a period of about two hours prior to the crime. He states that during this period of two hours he was en route to Dallas from El Paso upon a bus. He states that the crime had been committed just a few minutes before he had left the bus station. He states that this contradicted the victim's identification of him as the alleged robber and if his counsel had prepared the case and if he, petitioner, could have testified in his own behalf, which his counsel would not allow him to do, the case would have been dismissed.

Charges of similar nature have been made against the peace officers of the land until the Court felt it his duty to write the Attorney General of Texas who was handling the case on behalf of the State and to Honorable Eugene Jericho, petitioner's lawyer, an outstanding attorney of Dallas, calling their attention to the charges and telling them he felt that all evidence that would sustain the charges should be produced and the Court would expect them to have it, and if it would not sustain the charges, that all evidence that would show the facts, and if the police or the officers of the court were guilty of the charges made that they should suffer the penalties of the law, otherwise they should be exonerated.

At the hearing in which evidentiary testimony was taken to the full extent the petitioner Hyder alone testified in support of his petition. His manner and demeanor were impressive of one more concerned with the effect of his testimony than its truth.

The State put on Charles Batchelor, Chief of Police of the City of Dallas, who has an array of some 1,300 policemen under his control. He testified that after

many years' experience in training and conducting the police affairs of the City he had never had an occasion where the police of Dallas exercised any brutality towards the prisoner or ever coerced one into making a confession against his interest. He said he based that upon his own personal knowledge and his association with the police and upon the fact that he had a book of rules that he supplied every policeman with and had them taught and trained to observe its conditions which expressly forbade any brutal force to be used upon a prisoner or any means that would deceive or mislead him into making a confession and to advise him in all cases that if he wanted the benefit of counsel that he would be allowed to have it and that if he made a statement that was adverse to his rights it would be used against him, and being so warned the police invariably lived up to the regulations, that he was in touch with other officers holding positions in various stations of the police command and no such case was ever reported to him during the many years gone by.

A detective for the City force, R. M. Sims, who had held the position for a number of years, testified in the State court, and by agreement his testimony was read in the Federal court because he was at the time sick. His testimony was to the effect that he was present during the interrogation of the defendant in the court below, the petitioner Hyder, and that the confession was voluntary.

The witness McSpadden, a policeman who made the arrest, was put on the stand and he testified as did Detective Sims.

Honorable Ike Harris, a former member of the Legislature and an active practitioner before the Dallas bar, testified that he served in the State court under appointment of Judge Henry King, a judge of wide and continuing experience in criminal cases, that he represented Hyder in the State court and he did not tell him of any witness or any person that might be able to give any testimony in the case other than himself, that he made every investigation of the case to give the defendant a fair and impartial trial and of any evidence that might sustain his position as a defendant, that because of his criminal record he advised against defendant's taking the stand.

Judge Henry King himself was placed upon the stand and so testified in the case.

The petitioner Hyder was charged with robbery by assault or putting in fear of life or bodily injury. He was of the white race and intelligent.

One who is testifying in his own interest with a long term in prison in front of him is very much interested in the result of the trial. The officers of the court, the police, who in the routine of duty made the arrest, are much less interested. In the light of the testimony the Court refused the petition and ordered the petitioner back to the State penitentiary and expressly exonerated the police in the case and the officers of the law of any brutality.

## II.

The rash of habeas corpus cases being filed in Federal courts is a matter of some concern not only to the courts trying the particular cases but to the country as a whole. The Attorney General of Texas advises that he has 386 cases and more being filed almost every day.

We had some twelve or fifteen of the cases here on our table for trial and some four or five against local officers, particularly the Sheriff of the County filed by prisoners prior to their transportation to the State penitentiary. This latter group is handled by the local District Attorney whereas after they are inducted into the penitentiary the State of Texas is represented by the Attorney General of the State.

After Powell v. State of Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158, and some of the earlier decisions being rendered in habeas corpus cases, there was then a great rush into the Federal court, so much that the Judge presiding in a district that had a U.S. prison in it was swamped. Some relief was desired for these judges; and

to remove the congestion of these cases, the Act of Congress now referred to as Section 2255, Title 28, U.S.C.A., of date June 25, 1948, was the result of counsel and thinking jurists, among whom was Judge Parker, Chief Judge of the Fourth Circuit, whose memory ranks among us as one of the great jurists of the country, who was largely responsible for the act in question. It was the belief and hope that the number of habeas corpus cases would be lessened and certainly that the judges in the congested districts would be relieved if the petitioner ins' ad of filing a claim under the great habeas corpus act was required to file a petition in the Federal court wherein he was convicted asking that it be reopened. This act virtually, however, accomplished some things that were not intended. It went a long way towards destroying the finality of a judgment in criminal court.

The defendant in the penitentiary would think up some alleged promise that the District Attorney made or some beating that he got from a policeman. So he would come back to the court in which he was convicted with a plea to reopen the case, usually with no testimony except his own. These cases were numerous. The United States Code Annotated has something over 3,000 petitions for reopening the cases filed in the Federal courts. And the current has not let up. The three thousand only include those appealed. The petitioner may be a long-time prisoner and when his fellow prisoner has filed a like petition and come up and been treated kindly by the Judge and all the officers of the court he seems to go back and tell his associates about it and that he got to visit with his old friends while he was back at home, and the result is a new crop of petitions for reopening cases, a trip to see the home folks.

Just as we were getting accustomed to these cases it was held that State court judgments should be reviewed by Federal courts, and this produced the present rash of habeas corpus cases, now numbering thousands throughout the nation.

III.

A few years since, to wit, August 23, 1958, during a session of the American Bar Association in Los Angeles, California, there was also a Conference of State Judges which considered a report from its Committee on Federal-State Relationships As Affected by Judicial Decisions. The report was adopted by a vote of thirty-six Chief Justices of States present at the Conference. See the following excerpts:

"Your Committee on Federal-State Relationships as Affected by Judicial Decisions was appointed pursuant to action taken at the 1957 meeting of the Conference, at which, you will recall, there was some discussion of recent decisions of the Supreme Court of the United States and a resolution expressing concern with regard thereto was adopted by the Conference. * * *

* * * * * *

"Sixth, it is a part of our obligation to seek to uphold respect for law. We do not believe that this goes so far as to impose upon us an obligation of silence when we find ourselves unable to agree with pronouncements of the Supreme Court (even though we are bound by them), or when we see trends in decisions of that Court which we think will lead to unfortunate results. * * *

* * * * * *

"In the period when the Constitution was in the course of adoption the *Federalist* (No. 45) discussed the division of sovereignty between the Union and the states and said: 'The powers delegated by the Constitution to the Federal Government are few and defined. * * *

* * * * * *

"We cannot, however, completely avoid any reference at all to habeas corpus matters because what is probably the most far reaching decision of recent years on state criminal procedure which has been rendered by the Supreme Court is itself very close to a habeas corpus case. That is the

case of Griffin v. [People of State of] Illinois, 351 U.S. 12, [76 S.Ct. 585, 100 L.Ed. 891] which arose under the Illinois Post Conviction Procedure Act. The substance of the holding in that case may perhaps be briefly and accurately stated in this way: If a transcript of the record, or its equivalent, is essential to an effective appeal, and if a state permits an appeal by those able to pay for the cost of the record or its equivalent, then the state must furnish without expense to an indigent defendant either a transcript of the record at his trial, or an equivalent thereof, * * *

\* \* \* \* \* \*

"Just where Griffin v. Illinois may lead us is rather hard to say. That it will mean a vast increase in criminal appeals and a huge case load for appellate courts seems almost to go without saying. * * *

\* \* \* \* \* \*

"We are not alone in our view that the Court, in many cases arising under the Fourteenth Amendment, has assumed what seem to us primarily legislative powers. (See Judge Learned Hand on the Bill of Rights.) We do not believe that either the framers of the original Constitution or the possibly somewhat less gifted draftsmen of the Fourteenth Amendment ever contemplated that the Supreme Court would, or should, have the almost unlimited policymaking powers which it now exercises. * * *

\* \* \* \* \* \*

"It has long been an American boast that we have a government of laws and not of men. We believe that any study of recent decisions of the Supreme Court will raise at least considerable doubt as to the validity of that boast. * * *

\* \* \* \* \* \*

"Respectfully submitted:

"Frederick W. Brune,
Chief Judge of Maryland, *Chairman*

Albert Conway,
Chief Judge of New York

John R. Dethmers,
Chief Justice of Michigan

William H. Duckworth,
Chief Justice of Georgia

John E. Hickman,
Chief Justice of Texas

John E. Martin,
Chief Justice of Wisconsin

Martin A. Nelson,
Associate Justice of Minnesota

William C. Perry,
Chief Justice of Oregon

Taylor H. Stukes,
Chief Justice of South Carolina

Raymond S. Wilkins,
Chief Justice of Massachusetts"

In the resolution adopted by the Conference was the following:

"5. That this Conference hereby respectfully urges that the Supreme Court of the United States, in exercising the great powers * * * exercise one of the greatest of all judicial powers—the power of judicial self-restraint—* * *"

We will note a few more of these decisions as recently announced by the Court of Last Resort of the United States.

It is not within the province or purpose of the review of cases that we are now to consider to in any manner reflect upon the personnel of our United States Supreme Court, but to call attention to the accelerated trend of encroachment upon the duties and prerogatives of State government. Ours is a federated government, a federation of the States, and it would be unfortunate in our view for it to be merged into a total whole in empire-like proportions. Local self-government should be preserved and protected and remain within the realm of State power and authority.

FLORIDA: Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 decided March 18, 1963. Defendant convicted and sentenced on charge of burglary, a felony. Florida law allows the appointment of an attorney in capial cases, but not so in ordinary felonies.

The Supreme Court held that the judgment was void because an attorney was not appointed in a felony case. Such was not required by Florida law. The judgment of the Supreme Court thereby changed the law of procedure of Florida and that of all other States similarly situated, which includes such States as Maryland, Iowa and Texas and many others.

MARYLAND: March 18, 1963, found in the *Gideon* opinion of the Florida case. In the *Gideon* case the Court reversed itself in a decision that it had formerly made in a similar case from Maryland styled Betts v. Brady, 316 U.S. 455, 62 S.Ct. 1252, 86 L.Ed. 1595, the *Betts* case being set aside and the law of Maryland now made subject to the *Gideon* decision in Florida.

ILLINOIS: Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770, from the State court of Illinois. Defendant Charles Townsend was tried by a jury for murder in the criminal court of Cook County Illinois. The conviction was sustained by the higher court of the State of Illinois, but reversed by the United States Supreme Court in which holding it is recited:

"Under Illinois law the admissibility of the confession is determined solely by the trial judge, but the question of voluntariness, because it bears on the credibility, may also be presented to the jury."

The higher courts of the State of Illinois considered the case legally tried in accordance with its own law but were reversed in the above decision, and the rule of admission of confessions thereby changed from State statutes to Federal court decisions.

Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 decided June 22, 1964. The defendant was convicted and in the evidence there was offered a confession which the Supreme Court of Illinois upheld in sustaining the conviction. The United States Court overruled the Supreme Court of Illinois and held that the confession was not sufficient.

NEW YORK: Fay, Warden v. Noia, 372 U.S. 391, 83 S.Ct. 822, 9 L.Ed.2d 837, decided March 18, 1963. Noia was convicted in 1942 in the County Court of Kings County, New York, on charge of murder. The United States Supreme Court reversed and we find in its decision the following (from the syllabus):

"(d) Conventional notions of finality in criminal litigation cannot be permitted to defeat the manifest federal policy that federal constitutional rights of personal liberty shall not be denied without the fullest opportunity for plenary federal judicial review. Pp. 422–424, 83 S.Ct. pp. 839–841.

"(e) * * * (T)his Court has refused to concede jurisdictional significance to abortive state-court proceedings. Pp. 424–426 [83 S.Ct. pp. 841, 842]." 392, 83 S.Ct. 822.

Jackson v. Denno, 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908, decided June 22, 1964. Defendant convicted of murder in the State court of New York. His conviction was affirmed by the highest court of the State. The judgment of the State court was overturned and the decision then became the law of the land instead of the law of New York and consequently the law of fifty States.

OHIO: Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081. The defendant was convicted in the State courts. The conviction was affirmed by the Court of Last Resort of the State of Ohio. The Supreme Court of the United States reversed. It was a matter of sufficiency of a search warrant. The State court considered the case tried according to law of the State. The Federal court held otherwise and the search warrant must always be had and with certainty of care as to its contents.

IOWA: Long v. District Court of Iowa in and for Lee County, 385 U.S. 192, 87 S.Ct. 362, 17 L.Ed.2d 290, decided December 5, 1966. The petitioner was convicted of larceny and sentenced on October 21, 1963, to a term not to exceed five years. The State court held that habeas corpus being a civil action there was no provision in the law of the

State for the furnishing of a transcript without the payment of the fee, or for the appointment of counsel without the payment of fee.

Based upon this situation the United States Supreme Court ruled:

" * * * 'Destitute defendants must be afforded as adequate appellate review as defendants who have money enough to buy transcripts.'

" * * * Accordingly, the judgment below must be reversed and the cause remanded to the Supreme Court of Iowa for further proceedings not inconsistent with this opinion."

This Long case from Iowa more definitely announces the rule in Griffin v. People of State of Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891, and as expressly mentioned in the proceedings in the Conference of the State Judges.

The District Court of Iowa held: "Habeas corpus being a civil action there is no provision in the law for the furnishing of a transcript without the payment of fee, or for the appointment of counsel."

The Supreme Court held to the contrary, thereby setting aside the law of Iowa and gave it a rule of procedure instead, and this rule of procedure applies to all States where the same question arises.

It is worthy of note and important that the attitude of the two great courts of our country, the Supreme Court itself and the Supreme Courts of our several States, are viewing criminal jurisprudence from a vastly different angle.

In the State courts the guiding hand is to look to precedent; that is, the case that the Court has heretofore decided of similar nature. In this manner the law of the State is kept constant. That is to say, a lawyer may be able to tell his client what the law is on any given point, because the Courts are not changing it as they write decisions.

Our United States Supreme Court has taken the opposite view, that its decisions are not confined to disposing of the merits of the case alone but to the welfare of the whole nation. As expressed by one of their number in substance, the Supreme Court now looks to the welfare and the interest of the people as well as to the disposition of the given case. Therefore, the law of *stare decisis* prevails in the State court but no longer in the United States Supreme Court. The lawyer may not know what the law will be tomorrow from the law as it is today.

## IV.

It will hardly be questioned that Dean Pound, former Dean of the Nebraska University Law School and later for some forty years Dean of Harvard Law School in Massachusetts, was one of the greatest legal minds in the profession. We think it worth while to notice his attitude towards reversing cases on matters of procedure as is now done by the United States Supreme Court.

In 1906 Dean Pound addressed the American Bar Association at a session in St. Paul, Minnesota, discussing in detail the background of dissatisfaction with decisions of the Court. Fifty-eight years later the Minnesota Bar, the American Judicature Society and other bodies held a meeting again in St. Paul to honor the memory of the great speech delivered by the Dean. As a result of that meeting a plaque of magnificent proportions was written and is as follows:

"THE SPARK THAT KINDLED THE WHITE FLAME OF PROGRESS"

Wigmore

IN THIS BUILDING, ROSCOE POUND, THEN OF THE UNIVERSITY OF NEBRASKA, SUBSEQUENTLY DEAN OF HARVARD LAW SCHOOL, DELIVERED HIS HISTORIC ADDRESS "THE CAUSES OF POPULAR DISSATISFACTION WITH THE ADMINISTRATION OF JUSTICE," ON AUGUST 29, 1906, AT A CONVENTION OF THE AMERICAN BAR ASSOCIATION WHICH PROVIDED A PATTERN AND FURNISHED THE IMPETUS FOR JUDICIAL REFORM

IN WHICH BAR ASSOCIATIONS, LAW SCHOOLS, AND OTHERS HAVE BEEN WORKING TOGETHER TO IMPROVE THE ADMINISTRATION OF AMERICAN JUSTICE.

THIS PLAQUE PLACED HERE ON
JUNE 17, 1964
BY THE

MINNESOTA STATE BAR ASSOCIATION

RAMSEY COUNTY BAR ASSOCIATION

HARVARD LAW SCHOOL ASSOCIATION OF MINNESOTA

IN OBSERVANCE OF THE GOLDEN ANNIVERSARY OF THE AMERICAN JUDICATURE SOCIETY

From this great speech, honored on the above occasion, we take these paragraphs, 35 F.R.D. 273:

" * * * Justice, which is the end of law, is the ideal compromise between the activities of each and the activities of all in a crowded world. The law seeks to harmonize these activities and to adjust the relations of every man with his fellow * * *.

* * * * * *

. " * * * (T)he most efficient causes of dissatisfaction with the present administration of justice in America. * * * Uncertainty, delay and expense, and above all, the injustice of deciding cases upon points of practice, which are the mere etiquette of justice, * * *.

* * * * * *

" * * * One may search the recent English reports in vain for a case where an appeal has miscarried on a point of practice. Cases on appellate procedure are wanting. In effect there is no such thing. The whole attention of the court and of counsel is concentrated upon the cause. * * * (O)ur American reports bristle with fine points of appellate procedure. * * * "

The rift between the attitude on the doctrine of *stare decisis* by the Court of Last Resort of the State and the Supreme Court should not exist. As Justice Frankfurter in a dissenting opinion well says, it makes of the law like unto the drifting sand for uncertainty. If the practice of the United States Supreme Court is extended and continues, State jurisprudence will be entirely absorbed by Federal decisions changing its rules of procedure and State lines in the administration of the law are beginning already to fade and disappear.

As a spokesman for local self-government the Governor of one of the great States and a great Governor expressed himself in favor of the recognition of the State procedure and the right of local self-government.

The State of New York did not approve of national prohibition. The people wanted beer. They put up questions to their Governor: where does the Federal government begin and where does the State government leave off? His answer in effect was: Under the Constitution of the United States the State's power is the same that it always was and it possesses all those powers except those that have been expressly delegated to the national government. His words were in part as follows:

"I have been asked to talk about the respective powers of the National and the State Governments to rule and regulate, where one begins and the other ends. * * *

"As a matter of fact and law, the governing rights of the States are all of those which have not been surrendered to the National Government by the Constitution or its amendments. * * * (T)he conduct of public utilities, of banks, of insurance, of business, of agriculture, of education, of social welfare and of a dozen other important features. *In these Washington must not be encouraged to interfere.* (Emphasis ours)

* * * * * *

" * * * Thus, it was clear to the framers of our Constitution that the greatest possible liberty of self-government must be given to each State, and that any national administration

attempting to make all laws for the whole Nation, such as was wholly practical in Great Britain, would inevitably result at some future time in a dissolution of the Union itself.

"The preservation of this 'Home Rule' by the States is not a cry of jealous Commonwealths seeking their own aggrandizement at the expense of sister States. It is a fundamental necessity if we are to remain a truly united country. * * *

\* \* \* \* \* \*

"The doctrine of regulation and legislation by 'master minds,' in whose judgment and will all the people may gladly and quietly acquiesce, has been too glaringly apparent at Washington * * * Were it possible to find 'master minds' so unselfish, so willing to decide unhesitatingly against their own personal interests or private prejudices, men almost god-like in their ability to hold the scales of Justice with an even hand, such a government might be to the interest of the country, but there are none such on our political horizon, and we cannot expect a complete reversal of all the teachings of history:

\* \* \* \* \* \*

" * * * But what are the underlying principles on which this Government is founded? There is, first and foremost, the new thought that every citizen is entitled to live his own life in his own way so long as his conduct does not injure any of his fellowmen. * * * (A) free agent, the maker or the destroyer of his own destiny.

\* \* \* \* \* \*

"Let us remember that from the very beginning differences in climate, soil, conditions, habits and modes of living in States separated by thousand of miles rendered it necessary to give the fullest individual latitude to the individual States. * * * It must be obvious that almost every new or old problem of government must be solved, if it is to be solved to the satisfaction of the people of the whole country, by each State in its own way." Address of Franklin D. Roosevelt as Governor of New York, March 2, 1930.

## V.

There are suggestions that we have a Constitutional amendment to obviate this situation. This would necessarily hamstring the United States Supreme Court or be received by it as a direct thrust. The Supreme Court as an institution is sacred, sacred because of the great power and responsibilities conferred upon it by the founding fathers. Twice efforts have been made to pack the Court so as to change its attitude on questions, but the people have refused to do it because of their deference to the Court itself.

No court, high or low, is invulnerable to error, nor can the law be made waterproof or airtight. Reasonable latitude and discretion must be allowed. The judgment of the court must be respected as the law of the case rather than the law of the land. The legislative branch is still the policy-stating and law-making arm of the land.

The hiatus or the want of accord between the courts might be removed in a simple way, following in a measure the example of certain States, including Texas, by creating a United States Court of Criminal Review to hear the habeas corpus cases and all petitions to review any existing judgment heretofore entered in the Federal courts of the land. This court should be composed of judges who have had as much as ten years' actual courthouse experience either on the bench or at the bar. The decision should be final, thus securing to the nation a finality of criminal decisions which it does not now have.

The jurisdiction of this court should include all rehearings asked for under Section 2255, Title 28, of the present United States statutes annotated. This plan or some other similar plan should be devised to bring our two great courts into more harmonious accord.

I write this decision in my 91st year. I may not write again. I trust that no

reference to any of our judges or courts may be found disrespectful or disagreeable. I do think it is time for us to stop and take an inventory of where we are.